Good morning, and may it please the Court, and with apologies for my cold, my name is Parker Falls, and I represent the appellate Petro Star. With the Court's permission, I'd like to reserve two minutes for a reply argument. Yes, and please watch the clock. It counts down. Yes, Your Honor. I plan to spend most of my time discussing the district court's disposition of Petro Star's claim for breach of contract. That claim turns on the meaning of the phrase, taps tariff, in the agreements. The linchpin of the district court's order is its conclusion that if the parties had meant for oil prices to be adjusted, based on regulatory tariff changes, they would have said so. That is tantamount to interpreting the phrase, taps tariff, to mean the tariffs, in effect, at the time of delivery, even if they were temporary and subject to refund on a final regulatory determination of their lawfulness. There's no question about the representation at the trial of the parties. As I understand, they were well represented by outstanding lawyers. This was not a case where everybody didn't know how to practice law or that type of thing, nor these are sophisticated businesses. Doesn't that make a difference? This isn't a case where somebody was hidden from anything. Everything was there. The lawyers looked at the contracts. They'd done business together before. Why would the word tariff become inscrutable with the lawyers that were involved? It is certainly, I believe it is the case that in the trial court after this litigation began, both sides were represented by competent counsel. At the time the contracts were negotiated, Your Honor, there is no evidence that Petrostar was represented by counsel. There's no evidence of any negotiation with British Petroleum over the key pricing terms in this contract. British Petroleum did all the drafting from their headquarters in Ohio and presented it to Petrostar for execution. That is what happened in 1992. So we don't have any evidence of Petrostar ever turning it over to their lawyers to look at? There's no evidence in the record that that happened, no, sir. Is there a practice that was in the record that they would take a contract involving billions of dollars to let their lawyers look at it? Your Honor, this was a two- or three-page contract. It was handled by a business person, two business people at Petrostar, and there's no evidence of a practice that such contracts would typically be reviewed by counsel either. Excuse me, Judge Graber. Yes, Judge Graber. Judge Graber? No, I was going to ask you, it was my impression, and I'd like you to tell me if this is correct or not, that there were other contracts, including Petrostar's previous contracts with the state, that did include an adjustment feature if the tariffs should change. Is that a correct understanding? And if so, how does that affect our proper interpretation of trade usage at the time? There were related contracts prior to the date of these, one with the state of Alaska and one with Chevron, which were interrelated because Petrostar was buying oil from the state and returning oil that it did not fully process to Chevron. And so there were companion agreements, one of which did have provisions for rate adjustments, because at the time there was litigation going on, particularly over quality bank charges. It was on everybody's radar screen that there were likely to be regulatory changes once that litigation was resolved. And some of the provisions in the contract stated that there would be adjustments based on the outcome of those litigations. There are provisions in the Chevron contract which said there would not be. I don't think those contracts shed much light on a situation where there is simply nothing said one way or the other in a contract about what would happen in the event of future regulatory adjustments in the tariffs when there were no proceedings then ongoing, particularly when you understand that the way this contract worked, there were two different sets of tariffs that could impact the price. The interstate tariff is subtracted to back out the cost of shipping from Valdez down to the U.S. West Coast. The U.S. West Coast was pegged as the reference price because that happens to be where 95 percent of Alaska North Slope oil is sold. And so to get back to a wellhead price at pump station number one at the beginning terminus of the taps, you subtract the interstate tariff. But in this case, the oil was being shipped to intrastate locations, the two Petrostar refineries. So an intrastate would be added. If the Federal Energy Regulatory Commission, years after these contracts were entered into, reduced the interstate tariffs, that would have the effect of increasing the price paid to British Petroleum. If the Alaska Regulatory Commission... Would Petrostar have had to pay BP that amount under these contracts? Under the contracts as we understand them, the final interstate and intrastate tariffs would be used to determine the price at the end of any regulatory proceedings, and adjustments would be made. And at the end of it, the end of that offset, the price might on a net basis go up or it might on a net basis go down. And that is one of the problems with BP's argument that this was some sort of a bargained exchange in which they took the responsibility of the shipper and kept the results of any refunds. Because there was no way to know in 1992 or 1993 whether future regulatory proceedings would wind up benefiting the shipper or benefiting the buyer. It would depend on the direction in which those changes were made and in what tariffs those changes were made. Well, I think what Judge Eastline was grappling with was the fact that there was just no reference to proceedings in the contract. He was looking at the... I'm not saying what he did was right or wrong. I haven't really made a conclusion about that. But he said there's no language that refers to that, that brings it in, that says temporary, says final. There's just nothing in there. I think the best answer about the way that I believe the case should have been approached but was not is shown by a decision of the Alaska Supreme Court that Judge Weisslein did not have. It came out after the summary judgment was entered. It's the Tesoro v. Union Oil case. Why is that relevant at all? It's Ohio law that governs, not Alaska law. That is correct, Your Honor. There's nothing that I found in Ohio that is anything close to that case. The principles that the Alaska Supreme Court applied with respect to Alaska law are not different from the approach... Tell me what is the Ohio state law that is most relevant to our case here on this issue. The Alaska state law... I mean, did I say Alaska? Sorry. I meant Ohio. I'm going to have to go to Ohio whether I want to or not. I understand. The Alaska case law, and we cited it in our brief... No, no. Ohio. Ohio. Now I'm getting it. We're both doing it. Yes. The Ohio case law allows the consideration of extrinsic evidence, and in particular extrinsic evidence related to technical terms in the usage of a trade in order to determine the meaning of a contract and to determine whether contractual terms are ambiguous. And then it further allows consideration of a fairly wide variety of extrinsic evidence in resolving ambiguities. But they do have this espresso thing that they hang on to, which Alaska's Supreme Court is not. So there is a difference between the two. There are differences, but I think in the case of the Tesoro decision, the Alaska principles of law that were applied there are not different from the Ohio principles of law that would be applied in this case. That's the question that I have. In Alaska, they're sort of doing away with this kind of, if you don't say it, you know, it's not there. There's nothing in the Ohio cases that I've seen that they have made that change from the espresso dictum. In the Tesoro case, I mean, the reason why I think it's an interesting case, it's obviously not binding on this Court, is that it dealt with a net-back contract. These are net-back contracts in this case. There was a situation where the contract was silent as to whether regulatory changes would be passed through. The Court, if it had followed Judge Beislein's approach, would have simply said, well, there's nothing in the contract that says whether the tariff adjustments were passed through or not. End of story. You don't make a change after the fact. That's not what the Alaska Supreme Court did. What it recognized, which is true, is that references to tariffs in contracts for the sale of North Slope Alaskan oil inherently embody this regulatory environment. The Alaska Pipeline Act was in effect at the time our contracts were entered into. The Act explicitly says that the Alaska Regulatory Commission has the power to deem rates temporary, either on protest or on their own motion, and allow temporary rates to be collected but only and solely subject to the possibility of refund. How would you distinguish LIEKOS, L-A-I-K-O-S, the Ohio case? It seems to me it's contrary to your position. I don't. Is that the case that dealt with the- Decided on your opposition brief on page 22. One more time, Your Honor. Page 22 in the opposition brief. Yes, Your Honor. This case is used for the proposition. They make the argument that because of a subsequent change to the language dealing with quality bank adjustments, that that allows the court to infer that no pass-throughs of tariff changes would be proper. And that is an incorrect reading of those changes. Those changes, in fact, don't shed the kind of light on the pricing provision that BP would have. Recall that the price of the oil was determined through a net back provision, in which the tariffs were critical parts of the formula. Those were in two different sale contracts for each of the two refineries. At the time the first of the sale contracts was entered into, which was the contract for the Petrostar North Pole refinery, the language regarding quality bank adjustments was not present. That was added in the exchange contract that was entered into with respect to the Valdez refinery more than a year later. The pricing provision in the North Pole contract was moved over without change into the Valdez contract, the sales contract. The exchange contracts deal with oil that is returned to the pipeline. There is an administrative process in Alaska, where there is an administrator that determines the amount that someone returning oil to the pipeline has to pay to reflect the fact that the oil has been degraded by processing. So it is separate from the pricing provisions. It was added after the pricing provisions were entered into, not simultaneously. I think the more useful example of a situation where the parties made a change in the same agreement at the same time that shed light on what they meant by the pricing terms are the provisions that dealt with payments during the delivery month with respect to the price of oil. There is a provision in the contract, and we've cited this in our brief. It begins with a reference, the pricing formula, for the price on the U.S. West Coast, and it expressly provides that the West Coast price is to be the one, and I quote, in effect during the delivery month. There is no such language in the part of the same contract that says the tariff price is the one in effect during the delivery month. Now BP would have the court understand this reference to the West Coast price during the delivery month as a means of eliminating an ambiguity that might arise if BP changed the West Coast price a few days into the month and then wanted to make it retroactive to the first of the month. That's their explanation for this, but it makes no sense. It offered no evidence that that was the intended purpose of the language about determining the price during the delivery month. But, counsel, that provision that you're referring to refers to adjustments of payments, but not to adjustments in price. So you seem to be suggesting that they are the same, but why wouldn't those be two different things? On the face of that language about the West Coast price during the delivery month, that specifies that the price to be determined is the one that is in effect in the month in which deliveries are made. They could have drafted the balance of the formula to say the tariffs in effect during the month of delivery. That would have made absolutely clear that retroactive regulatory changes in the tariffs would not be passed through. That language is not in there. And I think under the rule that Judge Wallace was referring to in Ohio, that is a more logical application of the rule, that where a party in the same paragraph has added a specification that the price is the one that is in effect during the delivery month, not one that is subsequently changed, but adds no such language to the reference to the tariffs, that that is a better textual use of the language than the one they are trying to do, which takes language subsequently added with respect to quality bank adjustments. And I see that my yellow light has been on for a while now. Yes, and if my colleagues don't mind, there's another area I'd like to have you bring up so that your opposition can take it too, and they can charge me for the time. In this case, even if you're doing contract or some equitable basis, do you have to prove damages? I'm sorry, sir? Do you have to prove damages? I think we do have to prove damages. Now, if I understand, the price that you say they overcharged, that was passed on to other people down the line. By who? By your client. That is the argument that BP makes. The basis for that argument is their examination of a GAAP accounting statement, which showed that on a GAAP financial statement basis, Petrostar made a profit. That is not economically competent proof, particularly not on a summary judgment motion, that Petrostar had the power in the markets in which it competes for the sale of its refined product to pass along increases in transportation costs. It's a function of the nature of competitive dynamics in those markets. What is undisputed is that British Petroleum has been reimbursed twice for the same dollars. Petrostar paid it for what turned out to be excessive, illegal overcharges on the tariffs, and then the TAPS carriers paid it back for the same dollars because they were ordered to do so by the Regulatory Commission of Alaska. That is a windfall. There's no indication that anyone on either side of the table intended for that to happen when these contracts were entered into in 1992. That is the state of the evidence with regard to who earned a windfall as a result of the tariff overcharges. So if we fell in for you and you got the $22 million or whatever it is, would those customers to whom you passed it on then have lawsuits against you to get that money because they say it's a windfall for you and they were the ultimate people who paid? I doubt it, but I don't know. That's not a question that I have thought of. No. And I suspect it's one we may have to deal with because I was either in damage or equity, either in a contract or equity, I showed damage. It was a little baffling to me how you would go about determining that. If we are correct in the way the contract should be interpreted, there is a price that was owed to BP for oil. It is the function of a formula that incorporates the TAPS tariff. Our view is that there is at a minimum an ambiguity as to whether that means a temporary tariff or a final one, in which case it should be construed against BP under Ohio law. That is the rule. Without qualification, when we resort to extrinsic evidence, it doesn't help you determine the unambiguous meaning of the agreement. If that is correct, then, and the final tariff is the one that is to be used, there is a mathematical computation about how the price of oil for the years in question would change. And that computation would determine the amount by which Petrostar was overcharged under the tariff. There would be a contractual adjustment. And I think that would be the end of the question with regard to benefits. Except for many people who say they have a contractual obligation and they were overcharged. It would depend, I suppose, on the language of contracts between our customers for our refined products and us. I don't know how that would turn out. I don't know if any such claim would be made or how it would be resolved. We do know the way this contract is worded. And we know that the result the district court reached was to say it unambiguously means you do not get an adjustment. It is a result that, in our view, does not pay proper attention to the nature of this regulatory environment, to the uncontradicted expert testimony that we submitted, which is also present in the Tesoro v. Union. I've run your way over on my damaged question. I have a procedural question I need to ask. You didn't move for summary judgment, right? We did not. And what you're arguing is that for a reversal is based on the fact that the judge is a matter of law, said the term tariff was unambiguous, and that's wrong, so we would send it back because there's a genuine issue of material fact. I think procedurally if the court was to – We can't because you didn't move for judgment. We could not just rule in your favor. I think it is correct. I think if the court were to reverse on the ground that the extrinsic and intrinsic evidence compels the conclusion that the reference is to final rates, or if the court determined the contract was ambiguous and applied the Ohio rule of construction, the result would procedurally be a reversal and a remand. Now, at that point, we would move undoubtedly for summary judgment on the basis of this court's decision. And at that point, I think it would probably be a short step to that result, but we did not cross-move. That's correct. Thank you. Thank you. May it please the Court. James Speier for Defendant Appellee, BP Products, North America, Inc. As Judge Graber pointed out, before Petrostar entered into its contract with BP, Petrostar had a contract with the state of Alaska and with Sheppard, and that contract is very illuminating. That contract, by Petrostar's own admission, contained, quote, explicit provisions for retroactive price adjustments to reflect administrative proceedings and litigation. Who drafted that contract? The contract between the state and Petrostar. I believe it was the result of negotiations between the state and Petrostar, but I don't have a reference to the record for that. His argument, obviously, is that BP drafted these contracts, and so the fact that the language is expressly in there is not to be held against Petro. Well, I think the record shows, and I think we've cited, Your Honor, that there were extensive negotiations concerning the BP-Petrostar contract, and, in fact, there were numerous instances where Petrostar asked for specific concessions from BP, and BP gave those concessions to Petrostar, and, in fact, at his deposition, the chief negotiator for Petrostar said that he could not remember an instance where Petrostar asked for a concession and BP did not give it to them. So are you talking about the first? Careful, I have a question. Wait, just one second. I just want to be clear. Are you talking about the first contract? Because it seemed as though there's multiple contracts at issue, and it seems as though the others just followed with that same language regarding tariff. Your Honor, here's how it worked. There were a set of 1992 contracts for the sale and exchange of oil between Petrostar and BP at two different Petrostar refineries in Alaska, and then those contracts were replaced by a similar set of contracts in 1999 for the sale and exchange of oil at both Petrostar refineries in Alaska. So that's how it worked. Judge Graber had a question. Yes, I do, and the thing that most concerns me about your position in this case has to do with the course of performance, which under Ohio statutory law takes precedence over general trade usage. And I wonder if you could comment on the fact that your S&E, ConocoPhillips, did pass through tariff refunds under these contracts beginning in the year 2000, if I understand the procedures correctly. And if that was their interpretation of what the contract required, why doesn't that create an issue of fact as to the meaning of the contract? First of all, Judge Graber, Petrostar has never once pointed out or claimed that there is any disputed issue of fact that precludes the grant of summary judgment. That's just a matter of record in the briefs. But with respect to the ConocoPhillips question, Your Honor, what happened was in 2010, 18 years after Petrostar and BP entered into these contracts, in 2010, Conoco, which was the assignee from BP of these contracts, entered into a settlement agreement with Petrostar. And under the settlement agreement, the parties agreed to revise the amounts owed to each other because there had been revisions and refunds ordered of both the interstate tariff rate, which is regulated by FERC, and the intrastate tariff rate, which is regulated by the State of Alaska. As a result of those basically close to offsetting refunds, it ended up that Petrostar paid several million dollars to ConocoPhillips. That's true, but I guess it still strikes me as a potentially fair factual inference that for this to take place, ConocoPhillips had to agree that there was an offset or refund of these amounts retroactively. I would respectfully disagree that that inference is the only necessary inference, Your Honor, because when we deposed Petrostar's expert and we said, well, what would ConocoPhillips' position have been if this tradeoff between the interstate and intrastate had resulted in a net loss to ConocoPhillips, the expert said, I have no idea what they would do. And I think that's telling because the only thing that this settlement agreement shows is that ConocoPhillips believed in 2010 that it was in their self-interest to enter into the settlement agreement. And what we showed in our papers was that the ConocoPhillips settlement in 2010 cannot possibly be probative industry practice evidence for a contract that was entered into in 1992, 18 years before. Industry practice evidence is evidence of a practice so regular that it would have informed the party's expectations at the time of contracting. Okay? Except, Phil, so my question had to do not with industry practice, but specifically with the course of performance between the two parties to the contract. And it's true that they're not the original contracting party, but I understand your position is that there's no fair inference to be drawn, that they thought this was a requirement of the contract. But I think that it doesn't have to be under Ohio law industry-wide practice to be considered, and I guess that's my concern with your position. Judge Graver, what I would say to that is that course of performance evidence, if you're going to look at course of performance evidence, it has to be the party that actually did the performing. You can't attribute what Conoco did and call that course of performance evidence probative to BP's intent at the time it entered into the contract in 1992. You're making a point, Your Honor, that Tetrastar never made it, and I believe they never made it because course of performance evidence has to concern the party that is actually entering into the contract in 1992. That's not how I understand Ohio law, but I guess we'll try to parse that out as best we can. Thank you, Your Honor. No, so what concerns me is that the Tesorio case, which came down recently, said that the very term tax tariff is ambiguous and that we should look to extrinsic evidence, and that's not what the district court did here, but that is also consistent with the law of Ohio. The district court seemed to think that it wasn't ambiguous, and even though our decision isn't controlled by this recent case, we can deem it persuasive. So how do you respond to that? Thank you, Your Honor. Tesorio, in our view, is completely unhelpful to Tetrastar in this case, and I want to explain why. The court in Tesorio did not decide any issue on the basis of retroactivity. It simply did not hit that issue. What happened in Tesorio was Union Oil and Tesorio had a contract where Tesorio bought oil from Union and took possession of it up on the north slope at Pump Station 1, okay? The parties employed this net back pricing concept to arrive at a price for the oil on Pump Station 1, and the net back pricing concept said you'll take the west coast price of the oil and then you'll deduct the tariff to arrive at the price of the oil at Pump Station 1. You would also deduct the cost of shipping the oil from Valdez down to the west coast. The problem with the contract is it didn't specify whether it was referring to interstate tariff or intrastate tariff, and that turned out to be very important because there came a time when Alaska adjusted the intrastate tariff and reduced it, okay? And then Union Oil comes along and says, oh, you've reduced the intrastate tariff. So, therefore, our price that we should be allowed to charge to Tesorio should be higher because the way you get to the price is you take the west coast price and you deduct the price of the tariff. And so if the tariff is lower, Union Oil would end up with a higher price with which to charge Tesorio. So the only question in the case, Your Honor, is whether the word tariff referred to intrastate or interstate. And the expert evidence, the only expert evidence that the court found relevant, was the expert evidence of Tesorio's expert that said that in Alaska, in netback pricing contracts, when you deduct the tariff from the west coast price, you always use the interstate tariff. That was the end of the matter because as soon as it decided you use the interstate tariff, there's no cause for Union Oil to say, hey, we get a reduction. We have to be allowed to increase our price because the interstate tariff had never been reduced. That's the only point of Tesorio. It has no application in terms of helping this court decide this case. Now, one point that I would like to be able to make, Your Honors, is going back to the previous contract that Petrostar had with the state, this contract which did contain explicit provisions for retroactive price adjustments to reflect administrative proceedings and litigation. What Mr. Foltz said was that, well, it's understandable that that contract had that explicit provision because there were adjustments and there was litigation and regulatory proceedings going on at that time. And so that was on everybody's radar screen. But then Mr. Foltz said when BP and Petrostar entered into the contracts, there were no proceedings then ongoing with the implication that that kind of issue was not on everybody's radar screen. However, that is simply incorrect, Your Honor, and the record shows it. At the time the Petrostar BP contract were being negotiated, Petrostar was actively seeking a refund through litigation of interstate tariffs. So this issue of retroactivity was firmly on everybody's radar screen at the time BP and Petrostar entered into these contracts. Now, after the contracts with the state ended, Petrostar and BP entered into their contracts. Petrostar was not the shipper on these contracts and it never asked to be the shipper. By Petrostar's own admission, it was not the shipper because not being the shipper was part of what made it attractive to buy crude oil from BP. Now, not being the shipper had important consequences for Petrostar. Number one, they had no risk of loss of the oil during transport. Number two, they were not the party that actually paid the tariff to TAPS. Number three, as a result of that, they were not the party that became statutorily entitled to any TAPS refunds. Instead, BP was the shipper. BP bore the risk of loss, BP paid the tariffs to TAPS, BP became statutorily entitled to the refunds. That was the status quo. And Petrostar knew that was the status quo because of their involvement in simultaneous tariff challenges. If Petrostar wanted entitlement to refunds, even though it wasn't acting as the shipper, there would have to be a dramatic departure from the status quo. And that dramatic departure should and would have had to be clearly and unequivocally expressed in the agreement between the parties. But Petrostar never even asked BP for any language that would specify that tariff refunds should result in retroactive price adjustments. And they didn't do this despite the fact that Petrostar's chief negotiator could not recall a single instance where they asked for a concession during negotiations that BP didn't offer up. Was there evidence as to whether being the shipper was more burdensome or more beneficial? And I don't see how the role of shipper helps us interpret the meaning of tariff. The role of shipper is primarily important because the shipper bears the risk of loss. If something happens to the pipeline, if the pipeline is damaged by wildlife or the pipeline blows up, that will be on BP. BP is bearing the risk of loss there. That's the most important difference. But to try to answer your point more directly, the point is that as the shipper, BP was the one paying the tariffs and the one entitled to the refunds. So if there's going to be a change from that, if there's going to be a change from that state of affairs, that change should at the very least be clearly set out in the contract. It was not clearly set out in the contract. So I guess I think the most troublesome aspect of this, and I might as well just mention the elephant in the room, is that so the regulatory proceedings in Alaska determined that the tariffs that were being charged were illegal and unreasonable. And those are being charged, I guess, by one arm of BP, and yet they're determined to be unreasonable. And then another arm of BP gets the refund rather than the person, the entity that paid the unreasonable and illegal amounts that the tariffs later deemed to be. Your Honor, the tariffs that were charged during the BP-Petrostar relationship were temporary tariffs. They were temporary tariffs, and those temporary tariffs were determined and were approved and authorized by the Regulatory Commission of Alaska as a, quote, reasonable temporary tariff. They were authorized by the RCA. They have never been, the RCA nor anyone else has described them as illegal or unlawful. BP was allowed to charge these tariffs under the statutory framework of the Alaska pipeline. So I would take issue with the characterization that they're illegal or unlawful. All right, let me put it this way. So does the word temporary tariff appear in the contract? No. Okay, so why isn't it at least as reasonable to view the tariff as the, those tariff, but you understood them to be temporary because they were undergoing proceedings when they were being paid. So why isn't it reasonable to conclude that since they were understood to be only temporary when the proceedings finally ended and they said what, and the Regulatory Commission said what it should be, what the correct tariff should be, why isn't it reasonable to assume that's what the plaintiff should have paid? Because there's no mechanism or provision in the contract for paying over refunds that BP receives and has a right to receive as shipper to the other party. If there had been a provision in the contract like there was in Petrostar's previous contract with the state and like there were in other contracts entered into right around the same time that BP had its contract with Petrostar, then they would have a powerful argument, Your Honor. But there's nothing like that in the contract. All right. Does anyone else have any questions? Could I ask a question? At the end of the day, I've heard all your arguments interpreting the contract, but I'm going to have to find something in Ohio. I don't think that I can just turn to the Alaska Supreme Court unless there's something in Ohio that tells me that Ohio courts would adopt the Alaska case, and I haven't found that yet. What is the best case in Ohio for me to concentrate on in interpreting this contract? Well, Your Honor, I think correctly pointed out that the Lakos case in Ohio clearly sets forth the expressio unias principle that I think is one of the points that are pretty powerfully in our favor. And what the expressio unias point we're making is that the contract between BP and Petrostar didn't contain any express language regarding retroactive adjustments to tariff refunds. And your argument is that the fudging on expressos by the Alaska court has not been adopted in Ohio. Are there any other cases that I should read, or is there a determination from the Ohio cases that they rely expressly on the restatement or whatever? Where is the best library for us to make our determination if we were Ohio judges? Well, Ohio law is kind of funny, Your Honor, because the – Yeah. What I would say, Your Honor, is other than this difference between Lakos on expressio unias and the Alaska Supreme Court in Tesoro, I haven't found any material relevant differences between the two states in terms of basic contract law. I think the basic contract law is going to be the same. Okay. Then could we say that Ohio has not determined this action because their law was the same as Ohio State on the expressio? Could we say that Ohio would follow reasoned decisions of Alaska on the same issue and adopt it? Well, with the exception of this expressio unias point where they do appear different, and I agree that Ohio appears more favorable to us on that point only, obviously we believe we have many, many other compelling points in addition to the expressio unias point. I understand. But just looking at the Ohio law to apply the law to the facts we find or the factual context that's before us, it's just this one case that you feel is most If you give me a second, I can go through my brief and point out the cases. I've read your brief. Okay, well. I want the best one. You know, I don't want to read all of them. I think you're going to do well with Lakos. And there's another case, the name I can't recall, that sets out the basic contract law on course of performance and industry practice. This side of your brief? Yes. Okay. Thank you. Thank you, Your Honor. All right. Thank you, Counsel. And we will give you your two-minute rebuttal. Thank you. Is there something? No, I'm sorry. Counsel, is there something that you wanted to add? No. I'm sorry. If I had known that Mr. Fultz had a rebuttal, I probably would have gone on to some other points, but I'm fine. Oh, he asked for a rebuttal, and then we took him over with our questioning, and we gave you almost seven minutes. Okay, thank you. Okay. I would recommend three cases from Ohio. The Lakos case helps us. It doesn't hurt us, because the only part of the contract that it truly applies to is the pricing provision in which the reference to the West Coast price says during the delivery month, and the reference to tariff does not say that. There are two cases that deal in Ohio with the appropriateness of considering extrinsic expert testimony in considering whether contracts are ambiguous, and if they are, how they should be interpreted. One is Alexander v. Buckeye Pipeline, which is cited in our brief. One is Latina v. Woodpath Development Company, also cited in our brief. Finally, to pick up on Judge Graber's point, I believe it is true that when contracts are deemed ambiguous, after looking at the evidence of trade usage and surrounding circumstances, Ohio law is pretty encompassing in the kinds of evidence it can consider. We cited a case from the Federal District Court in the Southern District of Ohio, applying Ohio law, called Scott's Company v. Farnham Companies, which I think clearly points out that evidence that legitimately relates to the contract terms in issue in a case of an ambiguous agreement can properly be considered. It is not as rigid or as stratified, and I believe it would be appropriate to consider the evidence of subsequent performance by ConocoPhillips and PetroStar that Judge Graber asked about. One of those instances is the fact that PetroStar, when the Federal Energy Regulatory Commission reduced interstate rates, that would have the effect under these pricing provisions of retroactively increasing what they would have to pay BP and then ConocoPhillips for the oil. What did PetroStar do? It took an accounting reserve to account for the contingent risk that what they had paid for oil would have to go up as a result of a retroactive pass-through. That was not some decision that was made in light of this litigation, and it is undisputed that they did that. It is also undisputed, based on the testimony, that ConocoPhillips, applying the exact same pricing provisions under the succeeding version of the contract that their company assigned to ConocoPhillips, never took a contrary point of view about the pass-through of either intrastate or interstate tariffs. Those pass-throughs were in different directions, and so they had to be netted out, and they did agree in a settlement agreement on the amount to be netted out, but this insinuation that somehow this was cooked up in order to make this lawsuit better off for PetroStar than for BP, there is not a shred of evidence that that is, in fact, what happened. There is also a claim by counsel in his argument that these contracts back in 1992 and 1993 were extensively negotiated. All I can say, Your Honors, is to read the citations that are provided in their brief when they make those statements, and the citations that we have provided, all of the testimony is consistent. There were two small changes made. One of them was not even what PetroStar requested. It was less, and the consistent testimony, there is the BP witness said he could recall no negotiations over the pricing term. The two witnesses from PetroStar said they were not negotiated. They were presented by BP. There was no request made that BP assume the role as shipper. However, that was reflected in BP's original proposal to PetroStar. There was simply no evidence to support this idea that there should be some default understanding, because BP was the shipper, that there would be no pass-throughs unless BP expressly said there would be. That was never discussed, and, in fact, as I mentioned in my opening argument, you couldn't know in 1992 whether subsequent regulatory proceedings would wind up helping BP or hurting BP, because it would depend on what the Federal Energy Regulatory Commission might have done for interstate rates that would cause the price to go up and what the Alaska Regulatory Commission might do to intrastate rates and how the two. Right, but isn't that the point that you knew that the rate ultimately is subject to, in this case, the Alaska Regulatory Commission determination of what the intrastate rate was, and so knowing that, you agreed to a contract that didn't have a retroactivity term. That is not correct. But you know this is a highly, highly regulated area, I mean, obviously, by both state and federal agencies. At the time prior to these contracts being entered into, these regulatory proceedings crop up periodically over time. There was litigation going on at that time over the intrastate rates in front of the Federal Energy Regulatory Commission. None of the rates that were going to be charged in the future, no one could know whether they would be the result of any protest or not, and they were not from 1992 until 1997. 1997 is when these rates got protested, and that's when the Alaska Regulatory Commission suspended them from 1997 to 2000. And then two years after that, they determined that they were illegal and excessive. So I think the point is, Your Honor, there are certainly instances, if you look at contracts in the record, where the contracts are really not like this at all, they're short spot sales, where people don't want to have to remember years down the road that there's been some regulatory change so there'll be no pass-through. There are some contracts in the record that say there will be pass-throughs because there is something on their radar screen at that moment, such as the Quality Bank litigation that was going on at the time that BP added that language to the exchange agreements in 1993 and 1994. But the fact that the contract is simply silent does not mean, as the district court did, that it is therefore unambiguously means no pass-through. All right. So now you're kind of repeating, so let's not do that. But have you ever argued that there was a genuine issue of material fact here in this case? What we have argued, I believe, in the district court, and are certainly arguing here, is that summary judgment in favor of BP is inappropriate. We have taken the position that if the contract is unambiguous, we think it should be unambiguously construed in our favor, but if the contract is ambiguous, there is a clear rule of Ohio law that disposes of it. They have tried to argue that that rule is inapplicable because there are other ways that the court could resolve the ambiguity. Ohio doesn't say that. It says that if the court can determine through the consideration of extrinsic evidence that there is an unambiguous meaning to an agreement, then yes, you don't resort to that rule. But if the consideration of the evidence does not resolve the ambiguity, then you apply the rule. The only way I think we get to the point of a fact issue is if this court for some reason decides that that rule of construction should not be applied. And then we have an ambiguity, and there is definitely evidence. This argument you have heard today is really an argument about how facts should be interpreted, about whether there was or wasn't negotiation, about what people knew or didn't know at the time, about whether there was a reason for a protest or not. And I think if the court decides the Alaska rule doesn't apply but that the contract is ambiguous, then yes, they're back. All right. Thank you, counsel. Both arguments are very well done. Thank you. And this session of the court will be adjourned.
judges: Wallace, Graber, Wardlaw